UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/20/2020
```

------------------------------------------------------------ X

FLORIN TELEANU (A200747483) and  :
NATASHA TELEANU,                 :
                                 :
                     Plaintiffs, :
                                 :
                                 :        19-CV-8177 (VEC)
         -against-               :
                                 :        OPINION AND ORDER
                                 :
MARK KOUMANS, Acting Director of United  :
States Citizenship & Immigration Services, :
UNITED STATES CITIZENSHIP &      :
IMMIGRATION SERVICES, BARBARA Q. :
VELARDE, Chief Administrative Appeals :
Office, and ADMINISTRATIVE APPEALS :
OFFICE                           :
                                 :
                    Defendants.  :

------------------------------------------------------------ X

VALERIE CAPRONI, United States District Judge:

This action stems from the United States Citizenship and Immigration Services'

("USCIS") denial of Plaintiff Florin Teleanu's application for a waiver of the two-year foreign

residence requirement of his Nonimmigrant Exchange Visitor visa. Plaintiff and his wife

Natasha Teleanu ("the Teleanus") seek review of the administrative decision. Defendants moved

to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and,

in the alternative, for summary judgment on the merits. *See* Dkt. 28. Plaintiffs cross-moved for

summary judgment. Dkt. 34. For the following reasons, Defendants' motion to dismiss is

GRANTED in part and DENIED in part. Plaintiffs' cross-motion for summary judgment is

GRANTED.

## BACKGROUND

Florin Teleanu, a citizen of Romania, came to the United States in 2003 on a J-1

Nonimmigrant Exchange Visitor visa ("J-1 visa") to study economics and finance at Brandeis

University.  Second Am. Compl. ("SAC"), Dkt. 27 ¶¶ 1, 9.  J-1 visas provide temporary status to

foreign professionals who have "no intention of abandoning" their home countries but come to

the United States to work or study.  SAC ¶¶ 3, 8; 8 U.S.C. § 1101(a)(15)(J).  J-1 visas carry a

two-year foreign residence requirement that requires the holder to return to his home country

upon expiration of the visa for two years before applying for permanent legal residence in the

United States.  8 U.S.C. § 1182(e).  After his graduate program concluded in 2005, Mr. Teleanu

began working at Blackrock Financial Management ("Blackrock").  SAC ¶ 10.  Although Mr.

Teleanu's J-1 visa expired in 2006, he has continued to work for Blackrock on an annually-

renewed O-1 visa.[1]  SAC ¶ 10; Admin. R. ("A.R."), Dkts. 12-24 at 993–94, 1066.  To date, Mr.

Teleanu has not completed the two-year foreign residence requirement of his J-1 visa.  SAC ¶¶

10, 12.

In September 2015, Mr. Teleanu married Natasha Teleanu (née Waglow), a United States

citizen who is an Assistant United States Attorney.[2]  SAC ¶¶ 11-12.  In June 2017, Mr. Teleanu

applied to USCIS for a waiver of the foreign residence requirement of his J-1 visa on the grounds

that returning to Romania for two years would cause exceptional hardship to his wife.  SAC ¶

13; A.R. at 788-99, 982–92.  On August 8, 2018, the California Service Center ("CSC") of

USCIS denied Mr. Teleanu's waiver application.  SAC ¶ 13; A.R. at 496-99.  Although the CSC

agreed that Ms. Teleanu would experience exceptional hardship if she were forced to relocate to

Romania with her husband, namely because she would be unable to practice law there and would

face significant career setbacks upon her return to the United States, the CSC concluded that Ms.

---

[1]      O-1 work visas are limited to a small number of people who have risen to the top of their professional field.
8 C.F.R.§ 214.2(o)(3)(ii).  An O-1 visa has no time limit and may be extended indefinitely through annual petition
filings.  *See id.;* Defs.' Mem. of Law, Dkt. 29 at 1.

[2]      Ms. Teleanu is an AUSA in the Southern District of New York.  SAC ¶ 11.  The Government has been
represented in this matter by the United States Attorney from the Eastern District of New York.

Teleanu would not face exceptional hardship if she remained in the United States while her husband returned to Romania.  SAC ¶ 13; A.R. at 496-99.  The CSC explained that Mr. Teleanu failed to demonstrate that his wife would experience anything more than the usual emotional, physical, and financial difficulties associated with a temporary separation.  SAC ¶ 13; A.R. at 498-99.

Shortly before the CSC's decision, Ms. Teleanu gave birth to a son, J.T.[3]  SAC ¶ 12.  In September 2018, Mr. Teleanu appealed the CSC's decision and submitted evidence that his compliance with the two-year home residence requirement would cause exceptional hardship to J.T.  SAC ¶ 14.  Mr. Teleanu also argued that his departure would delay and potentially prevent him and his wife from having a second child because of Ms. Teleanu's advanced maternal age.[4]  *Id.*  On February 4, 2019, the Administrative Appeals Office of USCIS ("AAO") denied the appeal; the AAO concluded that the psychological and financial hardships to Ms. Teleanu and J.T. did not "rise beyond the common results of a two-year separation."  A.R. at 165.  Specifically, the AAO reasoned that the "ever-present stress concerning [her husband's] immigration status" was "not interfering with [Ms. Teleanu's] ability to attend to her daily activities and responsibilities," and that she would not face "exceptional difficulties" meeting her and J.T.'s financial needs.  *Id.* at 164.  With respect to J.T., the AAO concluded that although separating J.T. from his father "amounts to hardship," Mr. Teleanu had "not shown that his son's hardship exceeds the hardship ordinarily anticipated in such circumstances."  *Id*.

On September 12, 2019, the AAO denied Mr. Teleanu's motion to reopen and reconsider his waiver application.  SAC ¶ 16; A.R. at 2-4.  Although the the AAO acknowledged the Teleanus'

---

[3]     The Court will refer to the Teleanus' son as "J.T." to protect the child's privacy.

[4]     At the time this lawsuit was commenced, Ms. Teleanu was 38 years-old.  *See* SAC ¶ 11.

3

desire to have a second child, it noted that Mr. Teleanu had not established that his wife "would be unable to visit" him in Romania or that they would be unable to "pursue alternative medical avenues to continue their family planning efforts."  A.R. at 3.

Plaintiffs seek review and reversal of the USCIS' decision that Mr. Teleanu's two-year absence would not impose exceptional hardship on his wife and son; Plaintiffs argue that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); SAC ¶¶ 19-30.  Defendants move to dismiss for lack of subject matter jurisdiction, and, in the alternative, for summary judgment on the merits.  *See* Defs.' Mem. of Law, Dkt. 29.

## DISCUSSION

## I.   Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction is Denied

### A.  Legal Framework

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  When a court lacks subject matter jurisdiction, dismissal is mandatory.  *See* Fed. R. Civ. P. 12(h)(3); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

Under the APA, a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute" is entitled to judicial review of the agency action, unless judicial review is precluded by statute or the challenged decision was committed to agency discretion.  5 U.S.C. § 702; *Ruiz v. Mukasey*, 552 F.3d 269, 273 (2d Cir. 2009) (citing 5 U.S.C. § 701(a)).  An administrative decision is committed to agency discretion "where the governing law is 'drawn so that a court would have no

meaningful standard against which to judge the agency's exercise of discretion.'" *Vela-Estrada v. Lynch*, 817 F.3d 69, 71 (2d Cir. 2016) (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). In determining whether a "meaningful standard" exists for review of an agency's action, courts consider, *inter alia*, "the statutory language and structure, the statutory history, the nature of the agency action, and the regulations promulgated under the statute." *Treats Int'l Enters., Inc. v. S.E.C.*, 828 F. Supp. 16, 18 (S.D.N.Y. 1993) (citing *Dina v. Att'y Gen.*, 793 F.2d 473 (2d Cir. 1986)). There is a strong presumption that Congress intends administrative action to be subject to judicial review; the presumption can only be overcome by "clear and convincing evidence" to the contrary. *Sharkey v. Quarantillo*, 541 F.3d 75, 84 (2d Cir. 2008).

### B. The USCIS' Exceptional Hardship Determination Is Subject to Judicial Review

The Immigration and Nationality Act ("INA") provides that nonimmigrants admitted under J-1 exchange visas are subject to a two-year foreign residence requirement before they may apply for permanent residence in the United States. 8 U.S.C. § 1182(e). An applicant may request a waiver of the requirement on the grounds of exceptional hardship to the applicant's spouse or child.[5] *Id.* The waiver process has three steps. *Id.* First, the Secretary of the Department of Homeland Security ("DHS"), through his agents at USCIS, must determine whether the applicant's departure would impose "exceptional hardship" upon the applicant's spouse or child (if they are citizens or permanent residents). *Id.*; 22 C.F.R. § 41.63(b)(2)(i). If

---

[5]     The exact language of the statute is: "That upon the favorable recommendation of the Director, pursuant to the request of . . . the Commissioner of Immigration and Naturalization after he has determined that departure from the United States would impose exceptional hardship upon the alien's spouse or child (if such spouse or child is a citizen of the United States or a lawfully resident alien) . . . the Attorney General may waive the requirement of such two-year foreign residence abroad in the case of any alien whose admission to the United States is found by the Attorney General to be in the public interest . . . " 8 U.S.C. § 1182(e).

The INA has not been amended to reflect the agencies that currently handle waiver applications. While the hardship determination was previously made by the INS, today the determination is made by USCIS. The United States Information Agency ("USIA"), in turn, has been replaced by the Waiver Review Division, which is part of the Department of State. *See* Defs.' Mem. of Law, Dkt. 29 at 16 n.10-11; 22 C.F.R. § 41.63(b).

such hardship exists, the Secretary of DHS may then request a favorable recommendation from

the Waiver Review Division ("WRD") of the Department of State.  22 C.F.R. § 41.63(b)(2)(ii).

Upon a favorable recommendation from the WRD, the Secretary of DHS may waive the two-

year residency requirement if he finds it to be in the public interest.  8 U.S.C. § 1182(e); 22

C.F.R. § 41.63(b)(2)(iii).

Here, Plaintiffs seek judicial review of USCIS' decision that Mr. Teleanu's spouse and

child would not experience exceptional hardship if he were to depart for two years.  That is,

Plaintiffs seek review of the agency's decision at step one.  Defendants argue that the Court lacks

jurisdiction to review that decision because it is "solely within the government's discretion by

statute and is therefore 'isolated entirely from judicial review.'"  Defs.' Mem. of Law, Dkt. 29 at

15 (citing *Dina*, 793 F.2d at 476).  The Court disagrees.  At the outset, Defendants' reliance on

*Dina* is misplaced.  In *Dina,* the INS found that the immigrant's departure would cause

exceptional hardship to his citizen family but denied the waiver because the USIA recommended

against the waiver.  793 F.2d at 475.  Dina challenged the denial, arguing, *inter alia*, that USIA

had abused its discretion in recommending against the waiver.  *Id.*  The *Dina* court's holding,

therefore, was limited to the reviewability, *vel non*, of USIA's decision at step two; the circuit

had no occasion to consider the reviewability of INS's initial hardship determination.[6]  *Dina,* 793

F.2d at 476 (holding that "USIA's decision not to recommend waiver is not subject to judicial

review.").  The *Dina* court implicitly acknowledged this distinction by relying on and

---

[6]      The other cases cited by Defendants similarly focus on the reviewability of the USIA Director's failure to
make a favorable recommendation, rather than the reviewability of the initial hardship determination.  *See, e.g.,
Slyper v. Attorney Gen.,* 827 F.2d 821, 823 (D.C. Cir. 1987) ("Our task is to decide whether the district court had
subject matter jurisdiction to review the USIA Director's failure to make a favorable recommendation.  The
Immigration and Naturalization Commissioner's determination of exceptional hardship is not at issue, nor is the
Attorney General's discretion to waive the repatriation requirement."); *Singh v. Moyer*, 867 F.2d 1035, 1037 (7th
Cir. 1989) (addressing "whether a federal district court has subject matter jurisdiction to review the USIA's
unfavorable recommendation for a waiver of the two year foreign residency requirement").

analogizing to a "virtually identical" case that expressly distinguished between the reviewability

of the agency's hardship determination and the failure to make a favorable waiver

recommendation.  *Dina*, 793 F.2d at 476 (citing *Abdelhamid v. Ilchert*, 774 F.2d 1447, 1449 (9th

Cir. 1985) (noting the three-step process for obtaining a waiver of the home residence

requirement, explaining that "this case does not involve a challenge to an INS determination that

there would be no hardship," and ultimately holding that the district court lacked subject matter

jurisdiction to review the USIA Director's failure to make a favorable recommendation)).

The USCIS' initial hardship determination is subject to judicial review.  *See Al-Khayyal
v. INS*, 630 F. Supp. 1162, 1166-68 (N.D. Ga. 1986), *aff'd*, 818 F.2d 827, 831 (11th Cir. 1987)

(reviewing the agency's hardship determination for abuse of discretion); *Huck v. Att'y Gen.*, 676

F. Supp. 10, 13 (D.D.C. 1987) (noting that the "discretion exercised by INS [in making the

hardship determination,] while considerable, is not unbridled," and the "reviewing court must

ensure that the agency has articulated a reasoned basis for its decisions.") (internal quotation

omitted); *Slyper v. Att'y Gen.*, 576 F. Supp. 559, 561 (D.D.C. 1983) (reviewing the hardship

determination for abuse of discretion); *Keh Tong Chen v. Att'y Gen.* 546 F. Supp. 1060, 1061

(D.D.C. 1982) (finding the agency's hardship determination arbitrary, capricious, and an abuse

of discretion).[7]

The Court notes first that the statute does not expressly preclude judicial review.  *See* 8

U.S.C. § 1182(e).  Moreover, the legislative history, subsequent regulations, and internal agency

policies provide "meaningful standards" from which the Court can review the agency's decision.

*See Chaney*, 470 U.S. at 830.  For example, the legislative history indicates that Congress

---

[7]      *See also Yu v. Marshall*, 312 F. Supp. 229, 233 (S.D. Tex. 1970) (finding the agency's hardship
determination arbitrary and capricious); *Gras v. Beechie*, 221 F. Supp. 422, 424 (S.D. Tex. 1963) (holding that the
agency's hardship determination was not arbitrary); *Mendez v. Major*, 226 F. Supp. 364, 368 (E.D. Mis. 1963).

intended the two-year foreign residence requirement to be stringently enforced, even when the applicant is married to a United States citizen.  *See* H.R. Rep. No. 87-721 at 121 (1961) (noting that it would be "detrimental to the purposes of the program and to the national interests of the countries concerned to apply a lenient policy in the adjudication of waivers, including cases where marriage occurring in the United States, or the birth of a child [], is used to support the contention that the exchange alien's departure from this country would cause personal hardship.").  In other words, although the statute does not expressly define "exceptional hardship," the legislative history suggests that a citizen spouse or child's mere separation from the applicant does not automatically constitute such hardship.  *Id.*; *see also Gras v. Beechie*, 221 F. Supp. 422, 424 (S.D. Tex. 1963) ("The legislative history of Sec. 1182(e) [] indicates that voluntary separation is not a fact to be considered in assessing the degree of hardship.").  Courts routinely rely on this legislative history to guide their review of the agency's hardship determination.  *See, e.g., Talavera v. Pederson,* 334 F.2d 52, 58 (6th Cir. 1964) (reviewing the agency's hardship decision under the arbitrary and capricious standard and citing H.R. Rep. No. 87-721 to explain that exceptional hardship contemplates "more than normal personal hardship"); *Chen,* 546 F. Supp. at 1064 ("Courts have effectuated Congressional intent by declining to find exceptional hardship unless the degree of hardship expected was greater than the anxiety, loneliness, and altered financial circumstances ordinarily anticipated from a two-year sojourn abroad."); *Al-Khayyal.*, 630 F. Supp. at 1165.

Moreover, because subsequent regulations and internal agency guidelines circumscribe the way in which USCIS assesses exceptional hardship, the Court has meaningful standards with which to review the agency's decision.  *See Dina,* 793 F.2d at 477 (Oakes, C.J., concurring) (finding that the regulations promulgated under Section 212(e) of the INA "provide adequate

guidance to make review for abuse of discretion possible"); *Cassidy v. United States*, No. 17-CV-4187, 2018 WL 6088146, at *10 (E.D.N.Y. Nov. 20, 2018) (citing *Salazar v. King*, 822 F.3d 61, 76 (2d Cir. 2016)) (explaining that, in determining whether there are "judicially manageable standards," courts look to "the agency's regulations and informal agency guidance that govern the agency's challenged action.").  Here, subsequent regulations and the USCIS' policy manual specifically describe the method and procedure by which the agency determines whether an applicant's qualifying relatives will experience exceptional hardship.  *See* 22 C.F.R. § 41.63(b); Adjudicator's Field Manual, Chapter 45 Waiver of Section 212(e) Foreign Residence Requirement.[8]

In sum, because the Court is not "entirely bereft of any guiding principles by which [the agency's] action may subsequently be judged," *Dina*, 793 F.2d at 476, the agency's decision is subject to judicial review.[9]  Accordingly, Defendants' motion to dismiss for lack of subject matter jurisdiction is denied.[10]

---

[8]     The Adjudicator's Field Manual can be found at:
https://www.uscis.gov/sites/default/files/policymanual/afm/afm45-external.pdf.  Moreover, the DHS' form I-612 directs applicants to provide supporting evidence regarding the citizenship status of their qualifying relatives, evidence of their marriage and relationship, as well as any other documentation supporting their hardship claim.  *See* DHS form I-612, https://www.uscis.gov/i-612.

[9]     The Government cites *Nguyen Kin Lan Khanh v. Marks*, 357 F. Supp. 1248, 1252 (S.D.N.Y. 1972), in support of its argument that "granting [] a waiver under 8 U.S.C. § 1182(e) is, at each of several steps, purely a matter of discretion."  The Court agrees with Plaintiffs that this quotation is largely *dicta* taken out of context.  *See* Pls.' Mem. of Law, Dkt. 39 at 13.  *Khanh* involved a refusal to stay deportation of three immigrants, who were attempting to use the § 1182(e) waiver proceedings to postpone their pending deportations.  *Khanh*, 357 F. Supp. at 1253.  The court neither addressed nor discussed whether the exceptional hardship determination was reviewable.  *See id.*

[10]    Defendants' motion to dismiss Plaintiffs' discrimination claim (Count Seven) is granted.  Plaintiffs allege that the AAO's decision unlawfully discriminated against Ms. Teleanu on the basis of her age and gender.  SAC ¶ 32.  Plaintiffs' complaint, however, alleges no facts to support this claim.  Moreover, Plaintiffs' opposition fails to elaborate on the basis for this claim or to respond to Defendants' argument regarding the complaint's deficiencies.  *See* Defs.' Mem. of Law at 24.  As such, Plaintiffs' have abandoned their discrimination claim.  *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage . . ., a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

## II.  Defendants' Motion for Summary Judgment is Denied[11]

### A.  Legal Framework

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  When courts review agency action under the APA, however, "the question presented is a legal one which the district court can resolve . . . on a motion for summary judgment."  *City Club of N.Y. v. U.S. Army Corps of Eng'rs*, 246 F. Supp. 3d 860, 864 (S.D.N.Y. 2017) (quotation omitted); *Ass'n of Proprietary Colls. v. Duncan*, 107 F. Supp. 3d 332, 344 (S.D.N.Y. 2015) ("where a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal, and the entire case on review is a question of law.") (internal quotation omitted); *Noroozi v. Napolitano*, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (summary judgment is appropriate in APA cases because "the question [of] whether an agency's decision is arbitrary and capricious . . . is a legal issue amenable to summary disposition.").

The APA authorizes a reviewing court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007) (noting that section 706(2)(A)

---

[11]      Defendants moved to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(6) and in the alternative for summary judgment.  Plaintiffs cross-moved for summary judgment.  The Court will construe Defendants' motion as one properly brought under Rule 56.  *See Sikh Cultural Soc'y, Inc. v. U.S. Citizenship & Immigration Servs.*, No. 15-CV-5158, 2017 WL 1232476, at *9 (E.D.N.Y. Mar. 30, 2017), *aff'd*, 720 F. App'x 649 (2d Cir. 2018) (noting that because a court's review in an APA case presents only a question of law, such cases are frequently disposed of on cross-motions for summary judgment) (citing *Gosnell v. FDIC*, 938 F.2d 372, 375 (2d Cir. 1991)).  A Rule 56.1 statement is not required in a case seeking review of an administrative action under the APA because the case only presents a question of law.  *See Karpova v. Snow*, 402 F. Supp. 2d 459, 465 (S.D.N.Y. 2005), *aff'd*, 497 F.3d 262 (2d Cir. 2007).  Moreover, because "defendants made this motion in the alternative, under both Rules 12(b) and 56, plaintiff has always been on notice that the Court has been asked to grant summary judgment should that be appropriate."  *Id.* at 465.  Indeed, Plaintiffs themselves cross-moved for summary judgment.  As such, "no issue of motion conversion and notice is presented."  *Id.* (citing *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999)).

applies to "any agency action"); *New York Pub. Interest Research Group, Inc. v. Johnson*, 427 F.3d 172, 179 (2d Cir. 2005).  Judicial review of agency action under the arbitrary and capricious standard "is necessarily narrow," and the reviewing court may not "substitute its judgment for that of the agency."  *Islander E. Pipeline Co., LLC, v. McCarthy*, 525 F.3d 141, 150 (2d Cir. 2008).  Moreover, the court is "confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).  An agency's decision is arbitrary and capricious if the agency "relied on factors which Congress [did] not intend[] it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A reviewing court may also set aside an agency's decision as arbitrary and capricious if the agency failed to "examine[] the relevant data and [] set out a satisfactory explanation including a rational connection between the facts found and the choice made."  *Karpova*, 497 F.3d at 268.

In reviewing the USCIS' exceptional hardship determination, the Court must not overturn a decision "simply because it may prefer another interpretation of [the] statute." *Al-Khayyal*, 818 F.2d at 831 (citing *I.N.S. v. Wang*, 450 U.S. 139, 144 (1981)).  Instead, the Court must examine the administrative record to "ensure that the agency has articulated a reasoned basis for its decisions."  *Huck*, 676 F. Supp. at 11 (citation omitted).  The agency's hardship determination may be set aside as arbitrary and capricious, however, if the Court finds that the agency failed to "confront[] plaintiff's claims in a serious and sincere fashion," *id.*, and did not provide "explicit administrative consideration of evidentiary material in the record," *Chen*, 546 F. Supp. at 1064.

**B. The AAO's Hardship Determination Regarding Ms. Teleanu Was Not Arbitrary and Capricious**

Plaintiffs argue that the AAO's determination that Ms. Teleanu would not experience exceptional hardship by remaining in the United States while Mr. Teleanu returned to Romania was arbitrary and capricious.[12]  The Court disagrees.  Over the course of its three administrative opinions, USCIS expressly considered the evidence in the record and provided a reasoned basis for its decision.  Specifically, the CSC and AAO considered: (i) statements from the Teleanus; (ii) letters from Ms. Teleanu's obstetrician; (iii) a psychological report on Ms. Teleanu; (iv) the Teleanus' purported budget and expenses; (v) the Teleanus' bank statements and pay stubs; (vi) a letter from a legal consultant regarding Ms. Teleanu's job prospects were she to stop practicing law in the United States for two years; (vii) letters from the Teleanus' supervisors and colleagues; and (viii) United States Department of State Reports on crime rates and human rights violations in Romania.  *See* A.R. at 2-4, 161-65, 496-99.  The CSC explained that the emotional, physical, and financial hardship that Ms. Teleanu would experience if she remained in the United States would amount to "what is normally experienced when families are separated" but found that such hardship did not constitute "exceptional hardship." A.R. at 499.

On appeal, the AAO reviewed the evidence in the record and agreed with the CSC that Mr. Teleanu's departure would not impose exceptional hardship on his wife.  A.R. at 161-65. Specifically, the AAO concluded that Ms. Teleanu had failed to demonstrate that she would

---

[12]        Plaintiffs argue that because USCIS determined that Ms. Teleanu *would* experience exceptional hardship if she were forced to relocate to Romania, it should not have reached the issue of whether she would experience exceptional hardship by remaining in the United States.  Pls.' Mem. of Law, Dkt. 39 at 14-15.  The Court disagrees. Mr. Teleanu must show that his qualifying citizen relative would suffer exceptional hardship if she accompanied him to Romania *and* if she remained in the United States while he returned to Romania.  *Matter of Mansour*, 11 I. & N. Dec. 306, 307 (BIA 1965) ("[I]t must first be determined whether or not such hardship would occur as the consequence of her accompanying him abroad, which would be the normal course of action to avoid separation. . . . [F]urther, even [if] it is established that the requisite hardship would occur abroad, it must also be shown that the spouse would suffer as the result of having to remain in the United States."); *see also Huck*, 676 F. Supp. at 13.

experience exceptional emotional hardship beyond what "typically results from a two-year separation." *Id.* at 163.  The AAO pointed to Ms. Teleanu's psychological evaluation which indicated that although she experiences "ever-present stress concerning [her husband's] immigration status, the stress is in the background, and [] not interfering with her ability to attend to her daily activities and responsibilities." *Id.* at 163-64.  Moreover, the AAO explained that Ms. Teleanu's desire to have a second child did not amount to exceptional emotional hardship because there was no evidence that she would be unable to visit her husband in Romania, "pursue alternative medical avenues to continue their family planning efforts" during the two-year absence, or wait to conceive until after Mr. Teleanu returned to the United States.[13]  A.R. at 3.

      The AAO also concluded that there was insufficient evidence in the record to suggest that Ms. Teleanu would experience exceptional financial hardship by remaining in the United States without her husband.  The AAO explained that the Teleanus' purported budget failed to include sufficient documentation regarding Mr. Teleanu's current income, the couple's savings, childcare costs[14], or any other financial accounts that might offset their expenses.[15]  A.R. at 3,

---

[13]     The AAO acknowledged that Ms. Teleanu's advanced maternal age increases the risk of pregnancy but noted that there was no other medical evidence in the record to indicate that she "has any specific condition that would prevent her and [her husband] from successfully continuing their family planning efforts after the two-year period." A.R. at 3.

[14]     The Teleanus submitted a one-page flyer from a daycare center reflecting a monthly rate of $2,350. *See* A.R. at 164.  Although Mr. Teleanu indicated that they were on waiting lists for several facilities, the Teleanus failed to include comparable information about rates and hours for those facilities. *Id.* Plaintiffs also provided no corroborating evidence for their claim that supplemental care on evenings and weekends would cost $20/hour. *Id.* Without this evidence, the AAO explained that it was "unable to adequately assess the psychological or financial impact [on Ms. Teleanu] of managing their son's care." *Id.*

[15]     Plaintiffs' counsel claims that a single page, showing approximately $50,495 in a Citibank savings account, was "inadvertently omitted" from the administrative record.  Dkt. 34, Ex. 3.  A USCIS Supervisory Immigration Services Officer attested that USCIS never received the document.  Dkt. 35, Ex. 1.  The Court finds that Plaintiffs have not "put forth concrete evidence to show that the record was not properly designated" and cannot "meet their burden simply by asserting that the documents are relevant, were before or in front of [the agency] at the time it made its decision, and were inadequately considered." *Pac. Shores Subdivision v. U.S. Army of Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006).  Without deciding whether the information regarding the Citibank account was

164-65.  Moreover, although the AAO noted that Ms. Teleanu would likely need to move to a less expensive apartment and acknowledged the "inconvenience of such a move," the AAO explained that there was no evidence in the record to suggest that she "would be forced into living conditions that amount to a hardship."  A.R. at 164.

In sum, the AAO sufficiently considered the evidence in the record and "articulated a reasoned basis" for its decision that Ms. Teleanu would not experience exceptional emotional or financial hardship if she remained in the United States when her husband exited the United States to satisfy his two year foreign residency requirement.  *See Chen,* 546 F. Supp. at 1064.  As such, the agency's decision was not arbitrary, capricious, or an abuse of discretion.  *See Islander E. Pipeline Co.,* 525 F.3d at 150 ("A reviewing court may not itself weigh the evidence or substitute its judgment for that of the agency."); *Al-Khayyal*, 818 F.2d at 830, 832 (noting that the court's review of the hardship decision is "very restrictive" and upholding a hardship determination because the administrative decision "clearly indicates that all relative factors were considered."); *Yu v. Marshall*, 312 F. Supp. 229, 232 (S.D. Tex. 1970) (explaining that in reviewing the agency's hardship determination, the "Court cannot simply substitute its judgment for that of the agency official," but must simply determine whether "the decision is one without reasonable foundation.").[16]

---

provided to USCIS, the Court notes that the budget the Teleanus submitted to the agency does not account for the funds in that account.  *See* A.R. 295, 544, 549.

[16]      Although the AAO's decision was not arbitrary or capricious, it was, at the very least, somewhat cavalier in its consideration of the Teleanus' desire to have a second child.  While it is true that the couple could (presumably) conceive a child before Mr. Teleanu leaves or during a visit over the course of his two years in Romania or when he returns to the United States, none of these options presents an alternative without substantial hardship.  In the first two alternatives, Ms. Teleanu would end up going through a pregnancy and childbirth without the emotional, physical, and psychological assistance of the child's father, all while caring for a toddler and working in a full time, intellectually (and often emotionally) taxing job.  In the third alternative, due to her advanced maternal age, Ms. Teleanu would bear the risk of decreased fertility, increased risks of complications during the pregnancy, and increased risk of bearing a child (or having to decide to terminate the pregnancy) with birth abnormalities (*e.g.*, the chance of having a child with Down Syndrome increases with maternal age).  *See Pregnancy After 35*: *Healthy moms, healthy babies,* https://www.mayoclinic.org/healthy-lifestyle/getting-pregnant/in-depth/pregnancy/art-

14

**C.  The AAO's Hardship Determination Regarding J.T. Was Arbitrary and Capricious**

Plaintiffs also argue that the AAO's determination that Mr. Teleanu's two-year departure would not impose exceptional hardship on J.T. was arbitrary and capricious.  On this point, the Court agrees.  In support of their argument that J.T. would experience exceptional hardship, Plaintiffs submitted: (i) a report from psychologist Dr. Nardone on the impact of separating J.T. from his father during critical developmental years; (ii) a report from Dr. Moein regarding the risks to J.T. were he to remain in the United States with his mother; (iii) an affidavit from Ms. Teleanu explaining Mr. Teleanu's role in caring for J.T.; and (iv) an affidavit from Ms. Teleanu's mother, Nancy Waglow, regarding her inability to assist Ms. Teleanu with childcare responsibilities.  A.R. at 52-53, 612-14, 674-87, 800-07.  The Teleanus also cited several scientific articles that detail the permanent effects of parental separation on an infant's brain development in their application to the agency.  *See* A.R. at 40-41; Pls.' Mem. of Law, Dkt. 39 at 18-19.  Despite this evidence, the AAO summarily stated that, although separating J.T. from his father amounted to hardship, it did not "exceed[] the hardship ordinarily anticipated in such circumstances."  A.R. at 164.  This one-sentence conclusion entirely failed to address, or even mention, any of the evidence in the record pertaining specifically to J.T.[17]  *See Prapavat v. INS*, 662 F.2d 561, 562 (9th Cir. 1981) (explaining that the agency's "cursory reference to the citizen child's possible inconvenience" was a mere "laconic statement[]" that did "not discharge the Board's duty . . . to give reasons which show that it has properly considered the facts which bear on its decision.") (internal citations omitted).

---

20045756.  While those hardships do not add up to "exceptional" hardships in the eyes of the AAO, they are certainly different in kind and degree than the hardship that would be associated with a two-year separation if Ms. Teleanu were younger or if the couple were uninterested in having additional children.

[17]      The AAO similarly failed to address any of this evidence in its subsequent decision denying Plaintiffs' motion to reconsider.  A.R. at 2-4.

The Court acknowledges that judicial review of an agency's decision under the arbitrary and capricious standard "is necessarily narrow," and that the Court must not "substitute its judgment for that of the agency." *Islander E. Pipeline Co.*, 525 F.3d at 150.  Nevertheless, the AAO's determination that J.T. would not experience exceptional hardship by remaining in the United States without his father for two years is wholly unsupported, "entirely failed to consider an important aspect of the problem," and "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.  Specifically, the AAO failed to consider Dr. Nardone's opinion that separating J.T. from his father during J.T.'s formative developmental years would have an adverse impact on J.T.  Dr. Nardone explained that "critical stages of 'internalization' of parental relationships [] occur" during the early years of a child's life, and that it is during these early years that "a baby learns and remembers who the parent is."  A.R. at 682.  Moreover, Dr. Nardone explained that J.T.'s "brain and psychological development" is dependent, in part, on interaction with his father, and that "disrupting the bond and attachment" between J.T. and Mr. Teleanu would be detrimental to J.T.'s "cognitive, physical, and psychological development."[18] *Id.* at 682-84.  Dr. Nardone also noted that the anxiety that Ms. Teleanu would inevitably feel as a result of being separated from her husband could be transferred to and felt by J.T.  *Id.* at 682. Because experiencing anxiety early in life can cause "negative long-term effects on the brain and emotional development" of a child, Dr. Nardone opined that a two-year separation from Mr. Teleanu could lead to the development of an attention deficient or anxiety disorder.  *Id.*

Although the AAO acknowledged and relied on Dr. Nardone's psychological report in its consideration of whether Ms. Teleanu would experience exceptional hardship, it failed even to

---

[18]    Dr. Nardone notes that "seeing a parent on a computer or phone screen is no substitute for the sensual and psychological experience of human contact."  *Id.*

16

mention Dr. Nardone's opinion in its decision regarding J.T.  A.R. at 163-64.[19]  The Court is

"unwilling to affirm a decision which might result in the separation of a family when the

decision fails to reflect explicit consideration of substantive points in the record."  *Chen,* 546 F.

Supp. at 1066 (noting that "*had* the Regional Commissioner *specifically considered* the effects

on [the child] of separation from his [father] and found that these did not rise to the level of

exceptional hardship contemplated by the Act, the court might have been obliged to affirm the

[agency's] decision.") (internal quotation marks omitted) (emphasis added); *Huck*, 676 F. Supp.

at 13 (finding the agency's decision arbitrary and capricious because it "ignored the professional

opinion of the psychologist that the two-year separation" would cause permanent damage).

Moreover, to the extent that the AAO's decision that J.T. would not experience anything other

than "the hardship ordinarily anticipated in such circumstances," A.R. at 164, refers to the

hardship that any child, regardless of age, would experience due to separation from a parent, the

AAO disregards Dr. Nardone's opinion that Mr. Teleanu's two-year absence would constitute

exceptional hardship for J.T. specifically because of his current age and developmental state.

*See* A.R. at 682-84.  In other words, the AAO's decision "entirely failed to consider an important

aspect of the problem," namely J.T.'s tender age, and "runs counter to the evidence" in the

---

[19]     Defendants suggest that the AAO did consider Dr. Nardone's opinion in determining whether Mr. Teleanu's absence would cause exceptional hardship for J.T.  Defendants claim that the AAO explained that "concerns over childcare arguments . . . do[] not explain how these anxieties would be distinguishable from the common results of a temporary separation" and "acknowledge[d] that such a separation amounts to hardship, but [Mr. Teleanu] has not shown that his son's hardship exceeds the hardship ordinarily anticipated in such circumstances."  Defs.' Reply, Dkt. 35 at 10.  Defendants' argument combines two quotes from different portions of the AAO's decision.  The AAO's conclusion that Plaintiffs failed to demonstrate how "concerns over childcare arrangements" would amount to exceptional hardship was made in the context of evaluating whether Ms. Teleanu would experience exceptional hardship, not in the context of evaluating the impact on J.T.  The AAO's decision regarding J.T. is limited to one sentence and makes no reference to Dr. Nardone's opinion.  *See* A.R. at 164.  In all events, the issue of importance relative to J.T. is not whether his mother can make adequate childcare arrangements as a single parent for two years (the Court is confident that she, like many other single parents, can).  The issue, which the AAO simply did not grapple with at all, is the permanent harm that may be caused to J.T. from having his father removed from his life for two years, a length of time that is an eternity to a toddler.

record explaining the particularized impact that Mr. Teleanu's absence would likely have on J.T. at this stage in his development.[20]  *See State Farm*, 463 U.S. at 43.

The AAO similarly failed to acknowledge Dr. Moein's opinion regarding the impact of Mr. Teleanu's absence on J.T.  Dr. Moein, an Ob/Gyn doctor with over twenty years' experience in maternal and child health, noted that a two-year separation would affect J.T.'s "future health, wellbeing, and development permanently," and be "devastating" to J.T.'s relationship with his father.  A.R. at 806-07.  The AAO's decision does not indicate whether it considered this opinion in making its determination.  *See Chen,* 546 F. Supp. at 1066 (finding the hardship determination arbitrary and capricious because it was "unclear whether the Regional Commissioner's conclusion about anticipated hardship reflected a consideration of [the doctor's] observations").  As part of their waiver application, the Teleanus also cited numerous scientific articles that elaborated on the adverse impact a parent's absence has on an infant's cognitive, psychological, and emotional development, *see* A.R. at 40-41; none of those articles was addressed in the AAO's opinion.

Finally, the AAO failed to address the evidence in the record regarding Mr. Teleanu's role in caring for J.T. and the inability of any extended family members to assume that role.  Specifically, Ms. Teleanu attested that Mr. Teleanu cares for J.T. when she travels for work or works late hours at the office.  A.R. at 52-53 ("The only way I am either able to travel for work with overnight stays or work on trials is because I had Florin to care for [J.T.].  I do not have anyone else I can lean upon to do that if Florin is not here.").  The Teleanus submitted an

---

[20]      It should not take an expert report from a child psychologist to understand that the abrupt departure of one of two caring parents will have a different – and more traumatic – impact on a toddler than a similar departure would have on an older child.  Parents can explain what is about to happen to an older child.  An older child can talk on the telephone or interact with the absent parent through videoconferencing.  If the American citizen parent cannot take an extended leave from work so the child can have an extended visit with the absent parent, an older child can travel as an unaccompanied minor for an extended visit.  None of those methods of mitigating the hardship of an absent parent (or any other the Court can dream up) will be effective or available to mitigate the harm to a toddler.

affidavit from Ms. Teleanu's mother, confirming that she would be unable to assist with childcare because she lives in Florida and is the full-time caretaker of her own mother.  A.R. at 612-14.  The AAO did not mention either affidavit in its decision.

The Court understands that Congress did not intend for J-1 visa holders to be able to circumvent the two-year home residence requirement merely by having a child in the United States.[21]  *Chen*, 546 F. Supp. at 1064 (explaining that a "lenient policy in the adjudication of waivers, including cases where marriage occurring in the United States, or the birth of a child or children, is used to support the contention that the exchange alien's departure from this country would cause personal hardship" would be detrimental to the purposes of the program). Nevertheless, USCIS must still make a reasoned and thorough determination of whether an applicant's departure would cause exceptional hardship for the applicant's citizen child.  *See id.* (noting that the court's "insistence upon clear articulation of reasons in cases involving a . . . citizen-child is consistent [] with Congressional policy" and allows a reviewing court to "guard against arbitrary decisions which needlessly violate our nation's family tradition.").  Here, because the AAO failed to "articulate a satisfactory explanation" for why Mr. Teleanu's departure would not constitute exceptional hardship for J.T., and provided no indication that it gave "explicit administrative consideration [to the] evidentiary material in the record," the agency's decision was arbitrary and capricious.  *State Farm,* 463 U.S. at 43 (explaining that a court must be satisfied from the record that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."); *Chen*, 546 F. Supp. at 1061 (holding that

---

[21]    The Court notes, however, that it is highly unlikely that an applicant would marry a United States citizen and have a child simply to avoid the two-year home residence requirement.  *See Chen*, 546 F. Supp. at 1065-66 (explaining that while it "can be expected that some aliens will contract sham marriages in order to evade the immigration laws . . . it is less likely that aliens will have children, and far less likely that aliens will both marry and have children for fraudulent purposes.").

"because the Regional Commissioner's decision may cause separation of a family, the []
Commissioner's failure to set forth specific findings in support of his conclusion about
'exceptional hardship' was arbitrary, capricious, and an abuse of discretion.").

Given the central importance of the nuclear family in our nation's history, *Bastidas v.
Immigration & Naturalization Serv.,* 609 F.2d 101, 105 (3d Cir. 1979), there was a time when it
was highly unusual for the Government "to refuse to waive the foreign residence requirement
where the applicant has both a citizen-spouse and a citizen-child" because "failure to grant a
waiver would result in harm to more individual citizens." *Chen,* 546 F. Supp. at 1064. J.T., who
is, after all, an American citizen, deserves a more thoughtful consideration of the impact this
decision will have on him.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and
DENIED in part. Defendants' motion for summary judgment is DENIED. Plaintiffs' cross-
motion for summary judgment is GRANTED. This case is REMANDED for further proceedings
consistent with the opinion of this Court. The Clerk of Court is respectfully directed to close all
open motions and terminate this case.


**SO ORDERED.**

_____

**Date:  August 20, 2020               VALERIE CAPRONI**
**New York, New York               United States District Judge**

20